209 N.J. Super. 393 (1985)
507 A.2d 768
MORRIS COUNTY FAIR HOUSING COUNCIL, MORRIS COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE AND STANLEY C. VAN NESS, PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY, PLAINTIFFS,
v.
BOONTON TOWNSHIP, CHATHAM TOWNSHIP, CHESTER TOWNSHIP, DENVILLE TOWNSHIP, EAST HANOVER TOWNSHIP, FLORHAM PARK BOROUGH, HANOVER TOWNSHIP, HARDING TOWNSHIP, JEFFERSON TOWNSHIP, KINNELON BOROUGH, LINCOLN PARK BOROUGH, MADISON BOROUGH, MENDHAM BOROUGH, MENDHAM TOWNSHIP, MONTVILLE TOWNSHIP, MORRIS TOWNSHIP, MORRIS PLAINS BOROUGH, MOUNTAIN LAKES BOROUGH, MOUNT OLIVE TOWNSHIP, PARSIPPANY-TROY HILLS TOWNSHIP, PASSAIC TOWNSHIP, PEQUANNOCK TOWNSHIP, RANDOLPH TOWNSHIP, RIVERDALE BOROUGH, ROCKAWAY TOWNSHIP, ROXBURY TOWNSHIP AND WASHINGTON TOWNSHIP, DEFENDANTS.
AFFORDABLE LIVING CORPORATION, INC., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
MAYOR AND COUNCIL OF THE TOWNSHIP OF DENVILLE, DEFENDANT.
ANGELO CALI, PLAINTIFF,
v.
THE TOWNSHIP OF DENVILLE, IN THE COUNTY OF MORRIS; A MUNICIPAL CORPORATION OF NEW JERSEY, THE MUNICIPAL COUNCIL OF THE TOWNSHIP OF DENVILLE, AND THE PLANNING BOARD OF THE TOWNSHIP OF DENVILLE, DEFENDANTS.
SIEGLER ASSOCIATES, A PARTNERSHIP EXISTING UNDER THE LAWS OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
MAYOR AND COUNCIL OF THE TOWNSHIP OF DENVILLE, DEFENDANT.
MAURICE SOUSSA AND ESTHER H. SOUSSA, PLAINTIFF,
v.
THE TOWNSHIP OF DENVILLE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, SITUATE IN MORRIS COUNTY, AND THE DENVILLE TOWNSHIP PLANNING BOARD, DEFENDANTS.
STONEHEDGE ASSOCIATES, PLAINTIFF,
v.
THE TOWNSHIP OF DENVILLE, IN THE COUNTY OF MORRIS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, THE MUNICIPAL COUNCIL OF THE TOWNSHIP OF DENVILLE & THE PLANNING BOARD OF THE TOWNSHIP OF DENVILLE, DEFENDANTS.
JOHN G. VAN DALEN, ON HIS OWN BEHALF AND AS CO-TRUSTEE WITH JOHN P. CHESTER OF CHESTER AND VAN DALEN ASSOCIATES, INC., EMPLOYEES' RETIREMENT TRUST AND CHESTER AND VAN DALEN ASSOCIATES, A NEW JERSEY PARTNERSHIP, PLAINTIFFS,
v.
WASHINGTON TOWNSHIP, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, LOCATED IN MORRIS COUNTY, NEW JERSEY, DEFENDANT.
RANDOLPH MOUNTAIN INDUSTRIAL COMPLEX, A NEW JERSEY PARTNERSHIP, PLAINTIFF,
v.
THE BOARD OF ADJUSTMENT OF THE TOWNSHIP OF RANDOLPH AND THE TOWNSHIP OF RANDOLPH, A MUNICIPAL CORPORATION OF THE COUNTY OF MORRIS, STATE OF NEW JERSEY, DEFENDANTS.
ROBERT E. RIVELL, PLAINTIFF,
v.
TOWNSHIP OF TEWKSBURY, A MUNICIPAL CORPORATION LOCATED IN HUNTERDON COUNTY, NEW JERSEY, DEFENDANT.
ESSEX GLEN, INC., PLAINTIFF,
v.
MAYOR AND COUNCIL OF THE BOROUGH OF ROSELAND AND THE BOROUGH OF ROSELAND, DEFENDANTS.
Superior Court of New Jersey, Law Division, Morris County/Middlesex County (Mount Laurel II Litigation).
Decided October 28, 1985.
*399 Stephen Eisdorfer, Assistant Deputy Public Advocate, for plaintiff Morris County Fair Housing Council et al. (Alfred E. Slocum, Acting Public Advocate, attorney).
Arthur Penn for plaintiff Affordable Living Corporation.
Dennis A. Murphy for plaintiff Angelo Cali (Harkavy, Goldman, Goldman and Caprio, attorneys).
Douglas K. Wolfson and Jeffrey R. Surenian for plaintiffs Siegler Associates and Essex Glen, Inc. (Greenbaum, Rowe, Smith, Ravin, Davis and Bergstein, attorneys).
*400 Barney K. Katchen for plaintiffs Maurice Soussa and Esther H. Soussa (Citrino, Balsam, DiBiasi and Daunno, attorneys).
Guliet D. Hirsch for plaintiff Stonehedge Associates (Brener, Wallack and Hill, attorneys).
Carl S. Bisgaier for plaintiffs John G. Van Dalen and Van Dalen Associates, Inc. (Bisgaier and Pancotto, attorneys).
Richard T. Sweeney for plaintiff Randolph Mountain Industrial Complex (Sears, Pendleton, and Sweeney, attorneys).
Thomas J. Beetel for plaintiff Robert E. Rivell.
Edward J. Boccher, Deputy Attorney General, for intervenor State of New Jersey (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Michael R. Cole, First Assistant Attorney General and Deborah T. Poritz, Deputy Attorney General, of counsel; Michael J. Hass, Christine Steinberg and Nancy B. Stiles, Deputy Attorneys General, on the brief).
Stephen C. Hansbury for defendant Township of Denville (Harper and Hansbury, attorneys).
Alfred J. Villoresi and Debra K. Donnelly for defendant Washington Township (Villoresi and Jansen, attorneys).
Edward J. Buzak for defendant Township of Randolph.
Richard Dieterly for defendant Township of Tewksbury (Gebhardt and Kiefer, attorneys; Sharon Handrock Moore on the brief).
Alan Schussel for defendant Borough of Roseland (Shanahan and Schussel, attorneys).
Lewis Goldshore for amicus curiae Shongum Union Hill Civic Association (Goldshore and Wolf, attorneys).

 Outline of Opinion
 Page
 Introduction ......................................................... 401
 I. Constitutionality of the Fair Housing Act ........................ 403
 A. Background: The Mount Laurel Doctrine and the Legislative
 Response ..................................................... 403
*401 B. Delay in Enforcement of Mount Laurel Obligations under the
 Administrative Procedures of the Act ......................... 409
 C. Moratorium on Judicial Award of Builder's Remedies ........... 415
 D. Regions ...................................................... 421
 E. Prospective Need ............................................. 425
 F. Adjustments to and Limitations of Fair Share Obligations ..... 426
 G. Credits ...................................................... 428
 H. Regional Contribution Agreements ............................. 430
 I. Past Settlements and Repose .................................. 432
 J. Absence of Authority of the Council on Affordable Housing to
 Award Builder's Remedies ..................................... 433
 K. Conclusion ................................................... 434
 II. Exhaustion of the Administrative Remedies provided by the Act .... 435
 A. The Meaning of "Manifest Injustice" .......................... 435
 B. Morris County Fair Housing Council v. Denville; Stonehedge
 Associates v. Denville; Cali v. Denville; Siegler Associates
 v. Denville; Affordable Living Corp. v. Denville; Soussa v.
 Denville ..................................................... 441
 C. Morris County Fair Housing Council v. Randolph; Randolph
 Mountain Industrial Complex v. Randolph ...................... 445
 D. Van Dalen v. Washington ...................................... 449
 E. Rivell v. Tewksbury .......................................... 450
 F. Essex Glen, Inc. v. Roseland ................................. 452
 G. Conclusion ................................................... 455

SKILLMAN, J.S.C.
On July 2, 1985, Governor Kean signed into law the "Fair Housing Act" ("the act"). L. 1985, c. 222; N.J.S.A. 52:27D-301 et seq. This statute acknowledges, as determined by the Supreme Court of New Jersey in Southern Burlington Cty. NAACP v. Mount Laurel, 92 N.J. 158 (1983) ("Mount Laurel II"), that "every municipality in a growth area has a constitutional obligation to provide through its land use regulations a realistic opportunity for a fair share of its region's present and prospective needs for housing for low and moderate income families." L. 1985, c. 222, § 2(a). The primary change made by the statute is the establishment of an administrative framework for determining the extent of a municipality's Mount Laurel obligation and the manner in which it will be satisfied. Primary responsibility for administration of the statute is conferred upon a newly established state administrative agency called the Council on Affordable Housing ("the council").
*402 This court has before it motions based upon the act which have been filed by five municipal defendants in pending Mount Laurel cases. Denville, Tewksbury, Randolph and Washington seek transfer of the cases against them to the council and Roseland seeks dismissal. Some plaintiffs have responded to these motions by attacking the constitutionality of the act, contending that certain sections are facially invalid and that those sections are so central to the overall operation of the act that it must be declared invalid in its entirety.[1] In the alternative, all plaintiffs argue that, assuming the constitutionality of the act, this court should exercise the discretion conferred upon it by the act to deny transfer or dismissal and proceed to a judgment on the merits. All pending motions which seek transfer to the council or dismissal have been consolidated solely for the purpose of briefing and argument and the issuance of a decision as to the constitutionality of the act and, if valid, its impact upon the pending cases.
This court concludes, for the reasons set forth in part I of this opinion, that the act is constitutional on its face and that, to the extent individual sections raise constitutional problems, *403 those sections either are susceptible to interpretations which would preserve their constitutionality or, if unconstitutional, would be severable from the remainder of the act. This court further concludes, for the reasons set forth in part II, that it should retain jurisdiction over the cases against Denville, Randolph and Washington but that the complaints against Tewksbury and Roseland should be transferred to the council.

I

Constitutionality of the Fair Housing Act.

A. Background: The Mount Laurel Doctrine and the Legislative Response.
In Southern Burlington Cty. NAACP v. Mount Laurel, 67 N.J. 151 (1975) cert. den. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) ("Mount Laurel I"), the Court held that under Article I, paragraph 1 of the New Jersey Constitution a zoning ordinance which forecloses any opportunity of housing for lower income persons is not, absent unusual circumstances, in furtherance of the general welfare and is therefore invalid. Accordingly, the Court held that a municipality must provide an opportunity through its zoning for lower income housing, "at least to the extent of the municipality's fair share of the present and prospective regional need therefor." Id. at 174.
In Mount Laurel II the Court reaffirmed the constitutional analysis on which its decision in Mount Laurel I had been based:
The constitutional basis for the Mount Laurel doctrine remains the same. The constitutional power to zone, delegated to the municipalities subject to legislation, is but one portion of the police power and, as such, must be exercised for the general welfare. When the exercise of that power by a municipality affects something as fundamental as housing, the general welfare includes more than the welfare of that municipality and its citizens: it also includes the general welfare  in this case the housing needs  of those residing outside of the municipality but within the region that contributes to the housing demand within the municipality. Municipal land use regulations that conflict with the general welfare thus defined abuse the police power and are unconstitutional. In particular, those regulations that do not provide the requisite opportunity for a fair share of the region's need for low and moderate income housing conflict *404 with the general welfare and violate the state constitutional requirements of substantive due process and equal protection. [92 N.J. at 208-209]
The Court in Mount Laurel II also concluded that eight years experience with Mount Laurel I had demonstrated a need for more effective judicial remedies to enforce the constitutional rights recognized by its earlier decision. Therefore, it established an elaborate procedural framework for the adjudication of Mount Laurel cases. It appointed three judges to hear all Mount Laurel cases, who would be able to develop expertise in the subject matter, to provide some degree of consistency in trial court decisions, and to assign appropriate priority to this important area of public litigation. Id. at 216-217, 292-293. The Court also rejected decisions after Mount Laurel I which had held that "`fair share' allocations need not be `precise' or based on `specific formulae' to win judicial approval," id. at 206, and held that there must be "a determination by the court of a precise region, a precise regional present and prospective need, and a precise determination of the present and prospective need that the municipality is obliged to design its ordinance to meet." Id. at 257; see also id. at 215-216. Recognizing that public interest organizations lack the resources to bring a sufficient number of cases to provide effective enforcement of Mount Laurel obligations, it sought to increase the incentive for developers to pursue Mount Laurel litigation by holding that "where a developer succeeds in Mount Laurel litigation and proposes a project providing a substantial amount of lower income housing, a builder's remedy should be granted unless the municipality establishes that because of environmental or other substantial planning concerns, the plaintiff's proposed project is clearly contrary to sound land use planning." Id. at 279-280; see also id. at 218. The Court attempted to reduce the time needed to bring municipal zoning into compliance with Mount Laurel by specifying that the remedial stage should result in the adoption (even under protest) of a compliant zoning ordinance. Id. at 218, 285-291. It also held that compliance with Mount Laurel *405 may require adoption of zoning which provides affirmative measures to encourage construction of housing affordable to lower income families, such as requiring a certain percentage of units to be set aside for those families. Id. at 217, 260-274. The Court made a variety of other rulings, all with the common purpose of simplifying Mount Laurel litigation and promoting more effective enforcement of this constitutional obligation. For example, it required municipalities to take all reasonable steps to assist developers in obtaining subsidies, id. at 217, 262-265, and it held that a municipality's obligation to zone for a fair share of the regional need for lower income housing turns on whether it is located partly or wholly within a "growth area" designated by the New Jersey Department of Community Affairs in its State Development Guide Plan ("SDGP"). Id. at 215, 223-248.
While issuing these rulings to improve judicial administration of the Mount Laurel doctrine, the Court expressed in emphatic terms the desirability of legislative action addressed to the problem of exclusionary zoning. It stated that "we have always preferred legislative to judicial action in this field." Id. at 212. The Court also noted that its "deference" to certain limited legislative and executive initiatives in the field could be "regarded as a clear signal of our readiness to defer further to more substantial action." Id. at 213. However, it concluded that "[i]n the absence of adequate legislative and executive help, we must give meaning to the constitutional doctrine in the cases before us through our own devices, even if they are relatively less suitable." Id. at 213-214, emphasis supplied. Consequently, certain of the rulings set forth in Mount Laurel II may be viewed not as constitutional imperatives in themselves but rather as "devices" to promote more effective judicial enforcement of the Mount Laurel doctrine until such time as the Legislature might address the problem in another manner.
The Fair Housing Act is the legislative response to the Court's encouragement of legislative initiatives to address the problems of housing for lower income families. The legislative *406 findings include a declaration that "[t]he interest of all citizens, including low and moderate income families in need of affordable housing, would be best served by a comprehensive planning and implementation response to this constitutional obligation." L. 1985, c. 222, § 2(c). The central role in providing this comprehensive response is assigned to the Council on Affordable Housing. The council has the responsibility to determine housing regions, to estimate the present and prospective need for low and moderate income housing and to adopt "criteria and guidelines" for a municipality's determination of its present and prospective fair share of the housing need in its region. Id. at § 7. A municipality may elect to participate in the administrative procedures established by the act by notifying the council of that intention by November 2, 1985 and filing a "housing element" and "fair share housing ordinance" within five months after the council's adoption of its criteria and guidelines. Id. at § 9. Thereafter, a municipality may petition the council for approval of its housing element and implementing ordinance, which is called "substantive certification." Id. at § 13. The council also has the responsibility to "engage in a mediation and review process" if there is an objection to a municipality's petition for substantive certification or upon the request of a party to pending Mount Laurel litigation. Id. at § 15(a). A party which has filed a Mount Laurel case within 60 days of the effective date of the act must exhaust the procedures for mediation and review. Id. at § 16(b). A party to a case filed more than 60 days before enactment of the act also may seek transfer to the council, but the court may deny such an application if "transfer would result in a manifest injustice to any party to the litigation." Id. at § 16(a). If mediation is unsuccessful, the dispute may be referred to the Office of Administrative Law for hearing as a "contested case" pursuant to the Administrative Procedures Act. N.J.S.A. 52:14B-1 et seq. The act further provides that until expiration of the statutory period for the filing of municipal housing elements, "[n]o builder's remedy shall be granted to a plaintiff *407 in any exclusionary zoning litigation which has been filed on or after January 20, 1983, unless a final judgment providing for a builder's remedy has already been rendered to that plaintiff." L. 1985, c. 222, § 28.
The constitutional challenges to the act are premised solely upon the Mount Laurel doctrine. No party contends that the act offends any provision of the United States Constitution or any provision of the New Jersey Constitution other than the part of Article I, paragraph 1 on which the Mount Laurel doctrine rests.[2] Rather, plaintiffs argue that individual sections of the act, considered either independently or in combination, so fundamentally undermine the Mount Laurel doctrine that the act must be declared unconstitutional in its entirety.
The general principles which govern judicial consideration of any attack upon the constitutionality of legislation were described as follows in New Jersey Sports & Exposition Auth. v. McCrane, 61 N.J. 1 (1972):
One of the most delicate tasks a court has to perform is to adjudicate the constitutionality of a statute. In our tripartite form of government that high prerogative has always been exercised with extreme self restraint, and with a deep awareness that the challenged enactment represents the considered action of a body composed of popularly elected representatives. As a result, judicial decisions from the time of Chief Justice Marshall reveal an unswerving acceptance of the principle that every possible presumption favors the validity of an act of the Legislature. As we noted in Roe v. Kervick, 42 N.J. 191, 229 [199 A.2d 834] (1964), all the relevant New Jersey cases display faithful judicial deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised by the Legislature to serve a public purpose conform to the Constitution. And these cases project into the forefront of any judicial study of an attack upon a duly enacted statute both the strong presumption of validity and our solemn duty to resolve reasonably conflicting doubts in favor of conformity to our organic charter. Moreover, the conclusions reached in such cases demonstrate that in effectuating this salutary *408 policy, judges will read the questioned statute as implying matters requisite to its constitutional viability if it contains terms which do not exclude such requirements. [at 8]
There are a number of corollaries to the presumption of validity of legislative enactments which are pertinent to this case. One is that "a challenged statute will be construed to avoid constitutional defects if the statute is `reasonably susceptible' of such construction." New Jersey Board of Higher Ed. v. Shelton College, 90 N.J. 470, 478 (1982); Schulman v. Kelly, 54 N.J. 364, 370 (1969). Therefore, "where a statute is capable of two constructions, one of which would render it unconstitutional and the other valid, that which will uphold its validity must be adopted." Ahto v. Weaver, 39 N.J. 418, 428 (1963). Another is that a court may engage in "judicial surgery" or narrow the construction of a statute to preserve its constitutionality. Town Tobacconist v. Kimmelman, 94 N.J. 85, 104 (1983); New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n, 82 N.J. 57, 75 (1980). A further principle of judicial restraint is that challenges to the constitutionality of legislation "will not be resolved unless absolutely imperative in the disposition of the litigation." Ahto v. Weaver, supra, 39 N.J. at 428.
The case applying these principles which is most analogous to the present case is Robinson v. Cahill, 69 N.J. 449 (1976). In both Robinson v. Cahill and Mount Laurel the Court had determined that a long-established part of the system of local government violated the New Jersey Constitution. In Robinson v. Cahill the Court had held that statutes which governed the financing of local schools violate the guarantee of a "thorough and efficient" system of public education. In Mount Laurel the court had held that municipal zoning ordinances which failed to provide a realistic opportunity for the construction of lower income housing violate equal protection and due process guarantees. In each case the Court had urged the Legislature to respond to the deficiencies it found in existing laws. In each case, the Legislature, after prolonged debate, *409 enacted comprehensive legislation providing for enforcement by a state administrative agency of the constitutional rights involved  by the Commissioner of Education in Robinson v. Cahill and by the Council on Affordable Housing in this case. In Robinson v. Cahill, as in this case, plaintiffs pointed to a host of problems with the interpretation and implementation of the new law. See Robinson v. Cahill, supra (Hughes, C.J., concurring at 468-475; Conford, P.J.A.D., concurring at 476-511; Pashman, J., dissenting at 512-562. Nonetheless, a majority of the Court concluded that faithfulness to the presumption of validity of legislative enactments required it to sustain the validity of the law on its face and to afford the commissioner an opportunity to administer its provisions in a manner which would fulfill the constitutional guarantee of a "thorough and efficient" system of public schools. See also Abbott v. Burke, 100 N.J. 269 (1985). This court is convinced that a similar approach should be followed in reviewing the constitutionality of the Fair Housing Act.
There are two primary categories of challenges to the act. First, plaintiffs claim that requiring parties with pending Mount Laurel claims to utilize the administrative procedures of the act will result in unconstitutional delay in enforcement of Mount Laurel obligations. Second, plaintiffs claim that the provisions for the determination of regions, regional need for lower income housing, fair share allocations and credits fail to satisfy the requirements of Mount Laurel. Plaintiffs' claims that the act will unconstitutionally delay enforcement of Mount Laurel obligations are considered in parts IB and IC and their substantive challenges in parts ID through IK.

B. Delay in Enforcement of Mount Laurel Obligations Under the Administrative Procedures of the Act.
A central theme of the Mount Laurel II opinion is that vindication of the constitutional right recognized in Mount Laurel I had been thwarted by unjustifiable delays in the litigation process. The Court stated that:

*410 The obligation is to provide a realistic opportunity for housing, not litigation. We have learned from experience, however, that unless a strong judicial hand is used, Mount Laurel will not result in housing, but in paper, process, witnesses, trials and appeals. [92 N.J. at 199]
At another point it observed that:
Confusion, expense and delay have been the primary enemies of constitutional compliance in this area. [Id. at 292]
The Court conceived that the various procedural rulings set forth in its Mount Laurel II opinion would simplify and thereby reduce the time required to litigate Mount Laurel claims:
The remedies authorized today are intended to achieve compliance with the Constitution and the Mount Laurel obligations without interminable trials and appeals. Municipalities will not be able to appeal a trial court's determination that its ordinance is invalid, wait several years for adjudication of that appeal, and then, if unsuccessful, adopt another inadequate ordinance followed by more litigation and subsequent appeals. We intend by our remedy to conclude in one proceeding, with a single appeal, all questions involved. [Id. at 290]
Plaintiffs argue that exhaustion of the administrative procedures established by the act will take so long to complete and will produce such uncertain results that the delay and confusion condemned by the Court in Mount Laurel II will be reestablished  this time in the administrative rather than the judicial process. This argument is made most forcefully by plaintiffs with pending cases now close to completion.
The initial step in the administrative process is the council's determination of housing regions and present and prospective need for lower income housing, and the adoption of "criteria and guidelines" for individual municipalities to determine their fair shares. L. 1985, c. 222, § 7. The council has seven months after either January 1, 1986 or the confirmation of its last member, whichever date is earlier, to discharge this responsibility. Ibid. Once the council acts, any municipality which has elected to participate in the administrative process has five additional months within which to file a housing element and an implementing fair share housing ordinance. Id. at § 9(a). The next step in a case transferred from the courts to the council is *411 "review and mediation." Id. at § 15(a)(2).[3] It is unclear whether this process may occur simultaneously with municipal consideration of its housing element or only after submission of the housing element.[4] In any event, it would appear that mediation cannot be completed until the housing element is filed, since that is when a municipality will determine the contents of its Mount Laurel compliance plan. If mediation is unsuccessful, the next step in the administrative process is transfer of the matter to the Office of Administrative Law. Id. at § 15(c).[5] *412 The administrative law judge must issue an "initial decision" within 90 days. Ibid. The council has an additional 45 days within which to accept, reject or modify this initial decision. N.J.S.A. 52:14B-10(c). If the council denies or conditionally approves a municipality's fair share plan, the municipality has another 60 days within which to refile its plan with changes satisfactory to the council. L. 1985, c. 222, § 14(b). The municipality then has another 45 days within which to adopt the fair share housing ordinance approved by the council. Ibid. If the maximum period permitted by statute were taken at each of these steps, exhaustion of the entire administrative process would take more than two years from enactment of the act, that is, until September 1, 1987.[6]
*413 Plaintiffs further note that various uncertainties in the administrative process could result in an even longer period of time elapsing. For example, the time for issuance of an initial decision by an administrative law judge may be extended by the Director of Administrative Law "for good cause shown." Id. at § 15(c). Plaintiffs express skepticism whether a decision can be rendered within 90 days in a matter as complex as a Mount Laurel case, and consequently they fear that the power to extend the time for issuance of an initial decision will be liberally exercised. The act also fails to specify what consequences would flow from a failure to meet one of the statutory deadlines.[7]
If every party with a pending Mount Laurel case, including one close to conclusion, were required to exhaust the rather lengthy administrative procedures established by the act, its constitutionality would be difficult to defend. However, the Legislature has not imposed such a requirement. Rather, it has demonstrated an awareness of the danger of undue delay by requiring trial courts to determine, on a case by case basis, whether cases filed more than 60 days prior to the effective date of the act should be transferred to the council. In determining whether to transfer, the trial courts are directed to *414 "consider whether or not the transfer would result in manifest injustice to any party to the litigation." Id. at § 16(a). The legislative intent in including this provision in the act is discussed in detail in part II of this opinion. However, consistent with the principle that a statute should be construed so as to preserve its constitutionality, Ahto v. Weaver, supra, this exception to the requirement of exhaustion of administrative remedies should be read as broadly as is needed to avoid a declaration that the statute unconstitutionally delays adjudication of pending Mount Laurel cases.
The Legislature provided for retention of jurisdiction by the courts only in cases filed more than 60 days before the effective date of the act. L. 1985, c. 222, § 16. Therefore, it is necessary to consider separately whether the administrative procedures of the act will cause unconstitutional delay in connection with Mount Laurel cases filed after that cut-off date. The danger of unconstitutional delay in such cases may be easily avoided by invoking R. 4:69-5, which provides that administrative remedies need not be exhausted "where it is manifest that the interest of justice requires otherwise." Whatever may have been the intent of the Legislature, this court rule could be found applicable to cases filed within 60 days of enactment of the act if that were necessary to preserve its constitutionality.
Furthermore, the use of the procedures established by the act should not cause undue delay in cases filed within 60 days of enactment. Experience has demonstrated that Mount Laurel litigation, even under the simplified procedures set down in Mount Laurel II, is extremely time consuming. Detailed expert reports still must be prepared and lengthy discovery conducted before a case is ready for trial. The trials, which often have been bifurcated to simplify consideration of issues, have taken from a few weeks to a month. Moreover, the process of rezoning in conformity with Mount Laurel generally has taken *415 much longer than the 90 days envisioned in Mount Laurel II.[8] Therefore, if mediation under the act is successful, cases may be brought to a conclusion by the council sooner than if they were fully litigated before the courts. In addition, while some delay in bringing cases to trial will occur if mediation is unsuccessful, that delay should not be unduly lengthy because much of the review and analysis in the administrative process is the same as normal pretrial preparation.
In any event, the mere fact that the act may cause some delay in final disposition of some Mount Laurel claims does not render the Act unconstitutional on its face. As former Chief Justice Hughes observed in his concurring opinion in Robinson v. Cahill:
In the area of judicial restraint and moderation there is room for accommodation to the exigencies of government, as pointed out by Judge Conford, in the consideration of practical possibilities of accomplishment. Brown v. Board of Educ. of Topeka, 349 U.S. 294, 300-01, 75 S.Ct. 753, 756, 99 L.Ed. 1083, 1106 (1955). This Court has exercised this restraint in the timing of required accomplishment of a constitutional goal, without abandoning its eventual enforcement. [69 N.J. at 474-475]

C. Moratorium on Judicial Award of Builder's Remedies.
Section 28 provides in relevant part:
No builder's remedy shall be granted to a plaintiff in any exclusionary zoning litigation which has been filed on or after January 20, 1983, unless a final judgment providing for a builder's remedy has already been rendered to that plaintiff. This provision shall terminate upon expiration of the period set forth in subsection a. of section 9 of this act for the filing with the council of the municipality's housing element.
This moratorium could remain in effect until January 1, 1987.[9]
*416 There are two exceptions to the moratorium. First, it is inapplicable to cases filed before January 20, 1983. Second, the definition of "builder's remedy" limits its operation to "a court imposed remedy for a litigant who is an individual or a profit-making entity." Ibid. Therefore, the moratorium is inapplicable to litigation brought by a nonprofit public interest organization.
Section 28 raises substantial constitutional issues. The Court in Mount Laurel II determined that the municipal obligation to provide a realistic opportunity for the construction of its fair share of lower income housing may require affirmative governmental measures to make that opportunity realistic, such as density bonuses for developers who construct lower income housing or requirements that a certain percentage of housing units be set aside for lower income households. 92 N.J. at 260-274. It also determined that a developer who prevails in Mount Laurel litigation and is prepared to provide a substantial amount of lower income housing should be awarded a builder's remedy, that is, its land should be rezoned or its project approved, unless that remedy would be "clearly contrary to sound land use planning." Id. at 279-281. In the nearly three years since Mount Laurel II almost all new exclusionary zoning suits have been filed by developers. Furthermore, every plan for compliance with Mount Laurel, whether by court order or in settlement, has included mandatory set-asides. See, e.g., Allan Deane Corp. v. Bedminster Tp., 205 N.J. Super. 87 (Law Div. 1985); Urban League of Essex Cty. v. Mahwah Tp., 207 N.J. Super. 169 (Law Div. 1984). In short, the availability of builder's remedies and the imposition of mandatory set-asides have been the cornerstones of achieving compliance with Mount Laurel through litigation.
Section 28 appears to prohibit a court from awarding either of these remedies, for a period as long as 18 months, in any case to which it applies. Since there is substantial doubt whether a satisfactory Mount Laurel compliance plan can be devised, at least in most municipalities, without the use of *417 mandatory set-asides, the practical effect of the moratorium, if valid, would be to prevent a court from awarding any effective remedy.[10]
Judicial remedies are secured against legislative interference by the Judicial Article (Article VI) of the 1947 New Jersey Constitution. Hager v. Weber, 7 N.J. 201 (1951). This constitutional *418 restraint is applicable to actions in lieu of prerogative writs challenging the validity of municipal zoning ordinances. As stated in Fischer v. Bedminster Tp., 5 N.J. 534 (1950):
By the clearest language, the Constitution commits to the Supreme Court the regulation of the new remedies provided in lieu of prerogative writs. Review, hearing and relief shall be had on such terms and in such manner as the Supreme Court alone may provide by rule. In the administration of these remedies, there is to be no division of authority. It may well be that the framers of the Constitution were guided by what they considered the lessons of experience; but, whatever the reason, the provision is to be read and enforced in accordance with the plain terms of the grant. No distinction is made between the substantive jurisdiction to afford the relief theretofore available through the prerogative writs and the mode and manner of the exercise of the power. The whole is within the exclusive jurisdiction of the Supreme Court. Neither the exercise of the power inherent in the old Supreme Court by means of the prerogative writs nor the regulation of the remedy is subject to legislative control. [at 541]
Regardless of how it may be interpreted, § 28 appears to regulate remedies in Mount Laurel cases. Indeed, it appears to impose an absolute prohibition upon the award of certain judicial remedies for a specified period of time. Therefore, it is difficult to see how § 28 can be reconciled with the prohibition of the New Jersey Constitution against legislative interference with judicial remedies.
However, it is firmly established that "a court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation." Donadio v. Cunningham, 58 N.J. 309, 325-326 (1971); accord Ahto v. Weaver, supra, 39 N.J. at 428. Consequently, if possible, the pending motions should be decided without passing on the constitutionality of § 28.
Section 28 may never adversely impact upon the only two parties in the pending cases who seek to challenge its constitutionality, Stonehedge and Siegler. Both are developers who have filed Mount Laurel actions against Denville. However, the prime mover in the challenge to Denville's zoning ordinance has been the Public Advocate. Since the Public Advocate's action was filed on October 13, 1978 and both the Public Advocate and the other groups he represents are public interest *419 organizations, his suit is not subject to § 28. This means that in providing relief to the Public Advocate and his clients the court can order any property in Denville, including the property owned by Stonehedge and Siegler, to be rezoned with mandatory set-asides. Such rezoning at the behest of the Public Advocate would obviate the need to address the claims of Stonehedge and Siegler for "builder's remedies." Furthermore, since the primary burden of the attack on Denville's zoning ordinance has been carried by the Public Advocate, there is doubt whether any of the developer-plaintiffs who have filed suits against Denville will be found to have "succeeded" in Mount Laurel litigation and hence to be eligible for a builder's remedy. Allan Deane Corp. v. Bedminster Tp., supra, 205 N.J. Super. at 136-43; J.W. Field Co. v. Franklin Tp., 206 N.J. Super. 165 (Law Div. 1985). If the property owned by Siegler and Stonehedge is rezoned in connection with the Public Advocate's suit or if these plaintiffs are found to be ineligible for a builder's remedy, there could be a complete and final disposition of the claims against Denville without the court ever having to consider the constitutionality of § 28.
The constitutionality of the moratorium on builder's remedies probably will have to be decided before there can be a final judgment in the Van Dalen case, but Van Dalen has taken the position that this issue should be addressed at the compliance hearing rather than in connection with the pending motion to transfer. Consequently, the only party who clearly has a stake in the validity of § 28 has refrained thus far from mounting his challenge.
A further reason for not determining the constitutionality of § 28 at this time is that the issue has not been briefed in sufficient depth. Only two pages of Stonehedge's brief and three pages of Essex Glen's reply brief are devoted to the issue. The Attorney General's brief discusses § 28 at greater length but fails to address the most serious of the constitutional issues it raises. He cites the line of cases which have upheld temporary legislative moratoriums on development. See, e.g., Deal *420 Gardens, Inc. v. Board of Trustees of Loch Arbour, 48 N.J. 492 (1967); Kingston East Realty Co. v. State, 133 N.J. Super. 234 (App.Div. 1975); Meadowland Regional Dev. Agency v. Hackensack Meadowlands Dev. Comm'n, 119 N.J. Super. 572 (App.Div. 1972), certif. den. 62 N.J. 72 (1972). However, the most serious problem with § 28 is not that it will cause a temporary delay in some development projects but that it purports to restrict the remedies which may be awarded by the courts. Therefore, § 28 appears comparable not to legislation which would impose a moratorium on development but rather to legislation which would prohibit the courts from enjoining such a moratorium even if it were determined to be unconstitutional. Such a statute undoubtedly would be held unconstitutional on the authority of Hager v. Weber, supra, and Fischer v. Bedminster Tp., supra. The Attorney General's brief does not discuss these cases or the substantial constitutional issue they present.
The constitutionality of § 28 would have to be determined now if a holding of unconstitutionality of that section would result in an invalidation of the entire act. However, § 28 would be severable, leaving the remainder of the act intact, even if it were unconstitutional. Section 32 states that "[i]f any part of this act shall be held invalid, the holding shall not affect the validity of remaining parts of this act." This section raises a presumption that any section of the legislation is severable, if found to be invalid. This presumption may be overcome only by a showing that the invalidated section is essential to the overall legislative plan. State v. Lanza, 27 N.J. 516, 527-528 (1958); see also Newark Superior Officers Ass'n v. Newark, 98 N.J. 212, 231-232 (1985); Right to Choose v. Byrne, 91 N.J. 287, 311-312 (1982); Inganamort v. Borough of Fort Lee, 72 N.J. 412, 421-424 (1977); Affiliated Distillers Brands Corp. v. Sills, 56 N.J. 251, 264-265 (1970), mod. 60 N.J. 342 (1972). As stated in Affiliated Distillers:
Severability is a question of legislative intent.... The governing principle is whether it can be fairly concluded that the Legislature designed that statute to *421 stand or fall as a unitary whole. In reaching this conclusion, we must determine whether the objectionable feature can be excised without substantial impairment of the principal object of the statute.... An entire statute will not be invalidated when one clause is found to be unconstitutional unless that clause is so intimately interconnected with the whole that it can be reasonably said that the Legislature would not have enacted the statute without the offending clause.... [56 N.J. at 265; citations omitted]
Section 28 could be excised without substantial impairment of the principal objective of the act, which is to replace existing judicial remedies for enforcement of the constitutional rights recognized by Mount Laurel with administrative remedies which have the same ultimate goal. However, § 28 does not apply to proceedings before the council. It applies only to Mount Laurel cases which remain within the judicial system. Furthermore, it does not apply to cases filed before January 20, 1983 or to cases brought by public interest organizations. Therefore, the moratorium would be operative only under limited circumstances  cases filed by profit-making entities after January 20, 1983 in which the court concludes that a transfer to the council would cause "manifest injustice." Furthermore, even in those cases, the section expires by its own terms within a maximum of 18 months. Therefore, § 28 would be severable from the remainder of the act, even if ultimately found to be unconstitutional.
Under these circumstances, it is unnecessary to determine the constitutionality of § 28 in passing on the pending motions.

D. Regions.
In Mount Laurel II, the Court said:
[W]e indicated in Madison [Oakwood at Madison Inc. v. Madison, 72 N.J. 481 (1977)] our general approval of Judge Furman's definition of region (72 N.J. at 537), slightly modified, as "that general area which constitutes, more or less, the housing market area of which the subject municipality is a part, and from which the prospective population of the municipality would substantially be drawn, in the absence of exclusionary zoning...." A trial court's acceptance of any variant of this definition should be premised on special circumstances. [92 N.J. at 256]
On the other hand, § 4(b) of the act defines "housing region" as
a geographic area of no less than two nor more than four contiguous, whole counties which exhibit significant social, economic and income similarities, and *422 which constitute to the greatest extent practicable the primary metropolitan statistical areas as last defined by the United States Census Bureau prior to the effective date of this act.
Plaintiffs claim that this definition violates Mount Laurel II because it (1) limits housing regions to between two and four counties; and (2) requires significant social, economic and income similarities within the region. Plaintiffs also point out that, except for Van Dalen v. Washington Tp., 205 N.J. Super. 308 (Law Div. 1984), every trial court decision since Mount Laurel II has recognized that the applicable housing region or regions was larger than four counties. See, e.g., AMG Realty Co. v. Warren Tp., 207 N.J. Super. 388 (Law Div. 1984).
There is an element of arbitrariness in any method of delineating housing regions for the purpose of determining a municipality's regional fair share obligation.
The method which would appear to follow most closely the definition of region set forth in Mount Laurel II, that is, "the housing market area of which the subject municipality is a part," 92 N.J. at 256, delineates individual commutershed regions for each municipality. This method requires determining the time within which a person reasonably may be expected to commute to work and drawing a line around all municipalities which may be reached within that time. See Center for Urban Policy Research, Rutgers  The State University of New Jersey, Mount Laurel II: Challenge & Delivery of Low-Cost Housing at 36-44 (1983) ("Rutgers Report I"). However, there are serious practical problems in delineating commutershed regions. There is debate among the experts whether 30 minutes, 45 minutes or some other commuting time should be used in delineating such regions. Id. at 37-41. Moreover, once a reasonable commuting time is established, it must be determined how far a person can travel within that time during commuting hours. Id. at 41-42. The process of establishing a commutershed for purposes of Mount Laurel is further complicated by the fact that certain data which is required to determine the extent of regional need for lower income housing, such as population projections, is available only at the county *423 level. Therefore, the courts which have addressed the issue since Mount Laurel II, as well as scholarly commentators, all have agreed that Mount Laurel housing regions must be composed of whole counties. Van Dalen, supra, 205 N.J. Super. at 325; AMG Realty, supra, 207 N.J. Super. at 411-21; Rutgers Report I at 46-70; Center for Urban Policy Research, Rutgers  The State University of New Jersey, Response to the Warren Report: Reshaping Mount Laurel Implementation at 6-28 (1984) ("Rutgers Report II"). However, the use of whole county regions can have the effect of expanding the size of a region beyond the reasonable commuting distance on which the commutershed is premised. Furthermore, adjoining municipalities in the same county may be located in significantly different regions, if the few miles distance between them results in their individual commutersheds being drawn to include different counties. There is also a serious conceptual problem with commutershed regions. As convincingly demonstrated by the Center for Urban Policy Research at Rutgers, the total fair share obligations of all municipalities calculated on the basis of commutershed regions does not equal the total Mount Laurel housing need of the State. Rutgers Report II at 15-16.
The alternative to delineating individual commutershed regions for each municipality is to use fixed regions. Such regions avoid the need for determining an individual commutershed region for each municipality. Such regions also avoid the conceptual problem noted by the Center for Urban Policy Research. On the other hand, it is difficult to reconcile fixed regions with the definition of region set forth in Mount Laurel II. A municipality at the outer edge of a region may be a substantial distance from another municipality at the opposite end of the region and at the same time immediately adjoin a neighboring municipality which is outside the region. Therefore, a fixed region may not accurately reflect the housing market of a constituent municipality on the perimeter of the region. Furthermore, any attempt to address this problem by expanding the size of a region may result in a region which is *424 much larger than the housing market of any of its constituent municipalities. Rutgers Report II, at 8-9, 18-19.
In short, every approach to the delineation of regions for the purpose of establishing fair share housing obligations raises practical and conceptual problems. But as the court noted in AMG Realty, supra, "while the defining of regions is of paramount importance in designing a method to distribute fair share, it is only a vehicle toward accomplishing the ultimate goal  satisfaction of the constitutional obligation." 207 N.J. Super. at 411. Therefore, the issue is whether it is possible for the council to establish regions in accordance with § 4(b) which will satisfy the constitutional obligation.
Plaintiffs claim that the statutory requirement that the counties within a region "exhibit significant social, economic and income similarities" (L. 1985, c. 222, § 4(b)) will lead the council to draw regions which place urban counties and suburban counties in separate regions, thereby preventing satisfaction of lower income housing needs in urban counties. It is doubtful whether regions consisting solely of urban counties, such as a Hudson-Essex region, would be compatible with the goals of the Mount Laurel doctrine; the combination of a substantial need for lower income housing and the lack of available vacant land in these counties would make it unlikely that the total need for lower income housing could be satisfied. However, the general legislative directive that counties within a region "exhibit significant social, economic and income similarities" neither compels the inclusion of multiple urban counties in a single region nor prohibits the combination of urban and suburban municipalities. Moreover, this legislative directive must be read in light of the further legislative directive that regions "constitute to the greatest extent practicable the primary metropolitan statistical areas as last defined by the United States Census Bureau." Ibid. Some primary metropolitan statistical areas (PMSAs) mix urban and suburban counties: for example, the Newark PMSA consists of Essex, Union, Morris and Sussex counties. Rutgers Report I at 58-61. Therefore, it may be assumed that the Legislature did not consider an area which *425 includes both urban and suburban counties to be inconsistent with the statutory definition of region.
It is also significant that the legislative directives for defining regions appear fully consistent with the regions proposed by the Center for Urban Policy Research. The Center recommended the use, for the purpose of determining Mount Laurel obligations, of fixed regions composed of no less than two and no more than four whole counties which are to a substantial extent congruent with the PMSAs. Rutgers Report I at 51, 58-61. Furthermore, the Center viewed each of the regions it recommended as being "tied by social and economic linkages." Rutgers Report I at 67. Therefore, the adoption by the council of the Mount Laurel regions proposed by the Center would be consistent with § 4(b).
The rationale for use of those regions is set forth in two detailed, scholarly reports prepared by the Center. Rutgers Report I at 46-70; Rutgers Report II at 6-18. In brief, these reports conclude that the Rutgers regions reflect actual housing markets within the State, are sufficiently large to permit satisfaction of each region's lower income housing need and also enable each municipality to determine its fair share obligation more readily than the regions adopted by the court in AMG Realty. These conclusions are supported by expert testimony presented in the Public Advocate's suit against Denville, which showed that the fair shares of Denville and of other selected municipalities did not vary significantly when the Rutgers regions were substituted for the regions accepted by the court in AMG Realty.[11] Therefore, the regions proposed by the Center may be found to be consistent with the objectives of *426 Mount Laurel, and plaintiffs' attack upon the constitutionality of § 4(b) must be rejected.

E. Prospective Need.
The basic definition of "prospective need" contained in the act is:
a projection of housing needs based on development and growth which is reasonably likely to occur in a region or a municipality, as the case may be, as a result of actual determination of public and private entities. [L. 1985, c. 222, § 4(j)]
Plaintiffs do not challenge this basic definition,[12] but rather limit their challenge to the further legislative directive that in making a projection of housing need,
consideration shall be given to approvals of development applications, real property transfers and economic projections prepared by the State Planning Commission....
Plaintiffs argue that if only a small number of development applications have been approved in a region because of past exclusionary practices, municipalities would be rewarded by this legislative directive for practices which violate Mount Laurel.
However, all the Legislature has said is that "consideration" should be given to "development applications" in making projections of housing needs. It has not specified how development applications are to be considered nor what weight should be assigned to them. It is noteworthy that the experts for Van Dalen relied upon building permit data to validate use of an average of two sets of county population projections prepared by the Office of Demographic and Economic Analysis in the New Jersey Department of Labor to determine prospective need. The council may make similar use of data relating to development applications. The ultimate obligation of the council, as stated in the first sentence of the definition, is to determine future lower income housing need "based on development *427 and growth which is reasonably likely to occur." Therefore, it would be inappropriate for this court to assume in advance that the council will make inappropriate use of "development application" data in determining prospective need.

F. Adjustments to and Limitations of Fair Share Obligations.
Section 7(c)(2) imposes a duty upon the Council to
[a]dopt criteria and guidelines for ... [m]unicipal adjustment of the present and prospective fair share... whenever:
(b) The established pattern of development in the community would be drastically altered,
....
(g) Adequate public facilities and infrastructure capacities are not available, or would result in costs prohibitive to the public if provided....
Plaintiffs draw attention to the Supreme Court's direction, in Mount Laurel II, that "formulas that have the effect of unreasonably diminishing the share because of a municipality's successful exclusion of lower income housing in the past shall be disfavored." 92 N.J. at 256. Plaintiffs contend that because the magnitude of a municipality's current housing or population frequently will reflect past exclusionary zoning, any reduction in a municipality's fair share based upon "[t]he established pattern of development" would violate this direction. Plaintiffs also draw attention to a passage from Mount Laurel I which states that neither impact upon the local tax rate nor lack of infrastructure absolve a municipality of the responsibility of zoning for lower income housing. 67 N.J. at 185-186.
The grant of power to the council to authorize municipalities to adjust their fair shares poses potential problems. However, the council has not adopted "criteria and guidelines" implementing § 7(c) and no municipality has submitted a fair share housing plan which contains an adjustment of its fair share. Therefore, it is impossible at this point to determine how these sections actually will be implemented.
Furthermore, the Supreme Court has not said that the extent of existing development and infrastructure or the cost of expanding *428 infrastructure may play no part in fair share determinations. On the contrary, the significant role assigned "growth area" designations under the SDGP in determining the scope of Mount Laurel obligations suggests that these may be relevant factors. Under Mount Laurel II, only municipalities located partly or wholly in a "growth area" have any responsibility to zone for a fair share of the regional need for lower income housing. 92 N.J. at 223-248. Furthermore, under the methodology accepted by Judge Serpentelli in AMG Realty, supra, 207 N.J. Super. at 431-33, and by this court, with certain modifications, in both Van Dalen and in the Public Advocate's suit against Denville, the extent of growth area in a municipality is one factor to be considered in determining the magnitude of its fair share obligation. And the criteria for determining whether an area should be designated "growth" under the SDGP include the existing concentration of population and the existing sewer, water and roadway infrastructure. SDGP at 33-41, 47. Therefore, it is at least possible that any adjustments for existing patterns of development and infrastructure capacity pursuant to the council's guidelines and criteria will result in fair share determinations which do not differ materially from those previously approved by the courts.[13]
Plaintiffs also challenge § 7(e), which provides that the council:
[m]ay in its discretion, place a limit, based on a percentage of existing housing stock in a municipality and any other criteria including employment opportunities which the council deems appropriate, upon the aggregate number of units which may be allocated to a municipality as its fair share of the region's present and prospective need for low and moderate income housing.
It is urged that limiting a municipality's Mount Laurel obligation to a percentage of its existing housing stock would reward past exclusionary zoning policies.
*429 The short answer to this claim is that the council's powers under this section are purely discretionary. Therefore, it must be assumed that the council will refrain from exercising these powers in a manner which would violate Mount Laurel.

G. Credits.
The part of the act relating to fair share obligations which raises the most serious constitutional problems is its treatment of credits for existing lower income housing. Section 7(c)(1) provides:
Municipal fair share shall be determined after crediting on a one to one basis each current unit of low and moderate income housing of adequate standard, including any such housing constructed or acquired as part of a housing program specifically intended to provide housing for low and moderate income households.
Plaintiffs argue that if the total extent of present need for lower income housing is determined from 1980 census data, but municipalities may claim a credit for every housing unit of adequate quality occupied by a lower income household, there would be an unacceptable dilution in municipal fair share obligations. See Countryside Properties, Inc. v. Ringwood, 205 N.J. Super. 291, 305-306 (Law Div. 1984). The Public Advocate has submitted a memorandum prepared by his housing expert, Alan Mallach, which concludes that there are 295,020 housing units of adequate quality in New Jersey occupied by lower income persons who do not pay an excessive amount for housing. He assumes that all these units would qualify for the credit provided by § 7(c)(1). Mallach further notes that, depending on which fair share methodology is used, the total present and prospective need through 1990 for lower income housing in New Jersey is between 217,727 and 278,808 units. Therefore, he contends that literal application of the credits section of the act would result in recognition of credits which far exceed total statewide present and prospective need.
If the credits section of the act were interpreted as plaintiffs fear, its constitutionality would be difficult to sustain. However, such an interpretation is not compelled. On the contrary, *430 § 7(c)(1) poses a number of substantial problems of interpretation which this court must assume the council will resolve in conformity with Mount Laurel.
First, the act does not prescribe the method for determining present need. It does not indicate whether present need is to be determined as of 1985, 1980, or some earlier date. It does not indicate what data should be examined nor does it set any standard for determining present need. For example, it does not specify whether present need consists solely of lower income households which occupy physically inadequate housing, or also includes those which occupy physically adequate housing but pay a disproportionate percentage of their income for housing. Under these circumstances, it is appropriate to assume that the council will develop a methodology for determining the present need for lower income housing which is compatible with the methodology it uses for determining credits pursuant to § 7(c)(1).
The second major problem in interpreting § 7(c)(1) is that its key phrase, "current unit of low and moderate income housing of adequate standard," is not defined. If this phrase were construed to include every physically adequate housing unit occupied by a lower income person, it is possible, as concluded by Mallach, that regional present and prospective need would be offset completely by credits and that indigenous need would be minimal. However, this phrase could also be construed to include only units occupied by lower income families for which housing costs are not disproportionate to income and which are subject to appropriate controls upon rent or sales price.
Both the courts and a state agency such as the council have an obligation to construe legislation in a manner which will preserve its constitutionality. See State v. Genesis Leasing Corp., 197 N.J. Super. 284, 294 (App.Div. 1984). Therefore, the court must assume that the council will adopt an interpretation of the credits section which does not unconstitutionally dilute the Mount Laurel obligation.

*431 H. Regional Contribution Agreements.
The act establishes an administrative framework by which up to 50% of a municipality's fair share obligation may be transferred to another municipality. L. 1985, c. 222, § 12. Plaintiffs contend that these provisions are inconsistent with the prescription in Mount Laurel II that "if sound planning of an area allows the rich and middle class to live there, it must also realistically and practically allow the poor." 92 N.J. at 211.
There are three reasons why this attack upon the validity of the act must be rejected. First, the transfer provision is limited to a maximum of 50% of a municipality's fair share obligation. Therefore, it does not permit a municipality to remain solely an enclave for the rich and middle class. Second, the Court has never said that a municipality's fair share obligation may not be transferred to another municipality. Indeed, it intimated in Mount Laurel I that such a transfer might be appropriate:
Frequently it might be sounder to have more of such housing, like some specialized land uses, in one municipality in a region than in another, because of greater availability of suitable land, location of employment, accessibility of public transportation or some other significant reason. But, under present New Jersey legislation, zoning must be on an individual municipal basis, rather than regionally. So long as that situation persists under the present tax structure, or in the absence of some kind of binding agreement among all the municipalities of a region, we feel that every municipality therein must bear its fair share of the regional burden. [67 N.J. at 189]
This view of the Mount Laurel doctrine was cited with apparent approval in Mount Laurel II. 92 N.J. at 237-238. Therefore, the transfer provisions of the act may be considered an authorization for "binding agreements" between municipalities which may result in a regional zoning plan for lower income housing which is "sounder" than such zoning "on an individual municipal basis." Third, any proposal to transfer part of a municipality's Mount Laurel obligation to another municipality must be approved by the council, which must determine that "the agreement provides a realistic opportunity for low and *432 moderate income housing within convenient access to employment opportunities, and ... is consistent with sound comprehensive regional planning." L. 1985, c. 222, § 12(c). It must be assumed that the council will exercise this approval power in a manner which appropriately implements the objectives of the Mount Laurel doctrine.

I. Past Settlements and Repose.
Section 22 of the Act provides:
Any municipality which has reached a settlement of any exclusionary zoning litigation prior to the effective date of this act, shall not be subject to any exclusionary zoning suit for a six year period following the effective date of this act. Any such municipality shall be deemed to have a substantively certified housing element and ordinances, and shall not be required during that period to take any further actions with respect to provisions for low and moderate income housing in its land use ordinances or regulations.
Stonehedge claims that this provision is invalid because it would apply literally to any settlement of a Mount Laurel case, regardless of whether the settlement had been approved by a court or had resulted in any rezoning for lower income housing.
If section 22 were read to confer six years immunity from Mount Laurel litigation upon a municipality which had settled a Mount Laurel case without rezoning for any significant amount of lower income housing, its constitutionality would be difficult to defend. However, this is not the only possible interpretation, particularly if a narrower interpretation is required to preserve the constitutionality of this section. This court takes notice that the overwhelming majority of settlements in Mount Laurel cases have been submitted for court approval pursuant to the procedures outlined in Morris Cty. Fair Housing Council v. Boonton Tp., 197 N.J. Super. 359 (Law Div. 1984). The Legislature may be presumed to have been aware of these procedures for judicial approval of Mount Laurel settlements. Cf. Quaremba v. Allan, 67 N.J. 1, 14 (1975). Therefore the reference in § 22 to "a settlement of any exclusionary zoning litigation" should be construed to mean a settlement which has received court approval embodied in a judgment of compliance.
*433 Plaintiffs also claim that § 22 unconstitutionally expands the res judicata effect of a judgment of compliance recognized in Mount Laurel II by conferring six years immunity from further Mount Laurel litigation upon a municipality even if it subsequently undergoes a "substantial transformation." However, it is doubtful whether the passing comment in footnote 44 of the Mount Laurel II opinion that "[a] substantial transformation of the municipality ... may trigger a valid Mount Laurel claim before the six years have expired" (92 N.J. at 292) was intended to be a holding of constitutional dimension. In any event, the issue is purely hypothetical, since there is no indication that any municipality which has settled a Mount Laurel case has subsequently undergone a substantial transformation. Therefore, it is unnecessary at this time to determine whether the "substantial transformation" exception to the six years of repose obtained by a judgment of compliance is constitutionally mandated.

J. Absence of Authority of the Council on Affordable Housing to Award Builder's Remedies.
The Court in Mount Laurel II concluded that "builder's remedies must be made more readily available to achieve compliance with Mount Laurel." 92 N.J. at 279. Accordingly it held that "where a developer succeeds in Mount Laurel litigation and proposes a project providing a substantial amount of lower income housing, a builder's remedy should be granted unless the municipality establishes that because of environmental or other substantial planning concerns, the plaintiff's proposed project is clearly contrary to sound land use planning." 92 N.J. at 279-280. Plaintiffs point out that the act contains no comparable provision specifically authorizing the award of builder's remedies by the council, and they urge that without this incentive for builders to participate in proceedings before the council, the administrative process will not produce compliance with Mount Laurel.
There are three reasons why this attack upon the act must be rejected. First, other than the § 28 moratorium discussed in *434 part IC of this opinion, the act imposes no constraint upon the judicial award of builder's remedies if a municipality fails to participate in the administrative procedures established by the act or if those administrative procedures are exhausted. See §§ 9(b), 16, 18, 19. Second, the act provides inducements other than the threat of builder's remedies to encourage adoption of Mount Laurel compliance plans. Most significantly, a municipality which receives substantive certification of its compliance plan may obtain grants or loans of State money for lower income housing, which will reduce the municipality's burden in achieving compliance with Mount Laurel. Id. at §§ 20, 21. Third, the council may in the exercise of its regulatory powers determine that it has the power to award builder's remedies or to encourage in some other way participation by builders before the council. The Attorney General's brief correctly notes that:
plaintiffs offer no support for their proposition that the Council may not award a builder's remedy as a condition for granting substantive certification, and, in fact, no such prohibition exists. Implicit in the Act is the expectation that in approving a municipal housing element, the Council may require that techniques be implemented which will have an effect comparable to that achieved by a builder's remedy, but accomplished within the context of regional planning and not simply as a reward for a successful litigant.
In short, it is a matter of conjecture whether the procedures established by the act will be more or less successful than those set forth in Mount Laurel II in providing a realistic opportunity for the construction of lower income housing. Therefore, like many of the other attacks upon the act, the claim that the act is unconstitutional because it does not specifically authorize the award of builder's remedies by the council is premature.

K. Conclusion.
It is fair to say that the council will find itself walking through a constitutional minefield when it undertakes, in conformity with the act, to establish housing regions, to determine regional needs for lower income housing, to adopt "criteria and guidelines" for determining municipal fair share allocations and to review municipal petitions for substantive certification of *435 housing elements. However, appropriate respect for the legislative branch of government, and the council, precludes the court from assuming that the council will be unsuccessful in traversing the difficult course which lies before it. Rather, the proper allocation of responsibility among the coordinate branches of government requires the courts to defer to the council until it has been afforded an adequate opportunity to perform its responsibilities under the act in a manner which conforms with the constitutional mandate of Mount Laurel. Therefore, this court holds that the Fair Housing Act is on its face constitutional.

II

Exhaustion of the Administrative Remedies Provided by the Act.
The act contains two different requirements for exhaustion of administrative remedies. Exhaustion is mandatory with respect to cases filed within 60 days of the effective date of the act. L. 1985, c. 222, § 16(b). Discretion is conferred upon the trial courts in determining whether exhaustion should be required in cases filed more than 60 days before the effective date of the act. Id. at § 16(a). The case against Roseland was filed within 60 days of the act's effective date; hence, on the face of the act, exhaustion would be required. The cases against the other defendants were filed before the 60-day cut-off date; hence, the court is required to exercise discretion in determining whether exhaustion would be appropriate in those cases. This part of the opinion considers first in part IIA the general intent of the statutory exhaustion of administrative remedy requirement, and second in parts IIB through IIF the appropriateness of requiring exhaustion in the individual cases which are the subjects of the pending motions.

A. The Meaning of "Manifest Injustice."
The section dealing with the transfer of pending cases to the council was changed several times during the legislative process. As introduced in Senate Bill 2046, it provided that:

*436 Any court of competent jurisdiction shall have discretion to require the parties in any lawsuit challenging a municipality's zoning ordinance with respect to the opportunity to construct low or moderate income housing, which lawsuit was instituted either on or before June 1, 1984, or prior to six months prior to the effective date of this act, to exhaust the mediation and review procedure established in section 13 of this act. No exhaustion of remedies requirement shall be imposed unless the municipality has filed a timely resolution of participation. In exercising its discretion, the court shall consider:
(1) The age of the case;
(2) The amount of discovery and other pre-trial procedures that have taken place;
(3) The likely date of trial;
(4) The likely date by which administrative mediation and review can be completed; and
(5) Whether the transfer is likely to facilitate and expedite the provision of a realistic opportunity for low and moderate income housing. [section 14(a)]
Senate Bill 2046 was combined by the Senate Revenue, Finance and Appropriations Committee with another bill dealing with lower income housing, Senate Bill 2334, which resulted in adoption of a Senate committee substitute for the two bills. The transfer section was changed to provide:
For those exclusionary zoning cases instituted more than 60 days before the effective date of this act, no exhaustion of the review and mediation procedures established in this act shall be required unless the court determines that a transfer of the case is likely to facilitate and expedite the provision of a realistic opportunity for low and moderate income housing.
The substitute bill passed the Senate in this form but was amended in the Assembly to its final form, which states:
For those exclusionary zoning cases instituted more than 60 days before the effective date of the act, any party to the litigation may file a motion with the court to seek a transfer of the case to the Council. In determining whether or not to transfer, the court shall consider whether or not a transfer would result in a manifest injustice to any party to the litigation. [L. 1985, c. 222, § 16(a)]
The Assembly committee majority stated that the intent of the change was to:
establish that a court in determining whether to transfer pending lawsuits to the council must consider whether or not a manifest injustice to a party to the suit would result, and not just whether or not the provision of low and moderate income housing would be expedited by the transfer.
The majority statement is not particularly illuminating as to the meaning of the "manifest injustice" standard. However, the dissenting members of the committee expressed in emphatic *437 terms their dissatisfaction with the majority's failure to require all pending cases to be transferred to the council:
This bill does not prevent the courts from continuing in their current direction. Pending Mount Laurel cases may continue to be litigated.... The Republicans also offered an amendment that required the courts to transfer all pending litigation to the Housing Council. The language, as amended, is a step in the right direction, but does not go far enough. It is patently unfair to set up two bodies which can establish two separate housing standards. This bill could create that very situation.
There are a number of conclusions which may be drawn from this legislative history. First, the Legislature eliminated a detailed list of criteria for determining whether to transfer a case and substituted the single general standard of "manifest injustice." Second, while the standard under the Senate committee amendment would have been whether transfer would be "likely to facilitate and expedite the provision of lower income housing," the standard under the final version is whether transfer would cause "manifest injustice to any party to the litigation."[14] Third, while the bill in its final form expresses a stronger preference than earlier versions for transfer of pending cases to the council, it contemplates that some pending cases will continue to be litigated within the judicial system. Fourth, neither the act nor the accompanying legislative statement provides a definition of the phrase "manifest injustice" or any other guidance as to its interpretation. Therefore, it is the responsibility of the courts to interpret this phrase in a manner which is consistent with the overall intent of the act and which will not undermine the constitutional rights protected by the Mount Laurel doctrine.
*438 The parties correctly point out that the phrase "manifest injustice" is used in a number of different contexts in the New Jersey court rules and judicial decisions. In urging a restrictive interpretation of "manifest injustice," the defendant municipalities point out that this phrase is used in R. 3:21-1, which governs the withdrawal of guilty pleas in criminal cases after sentencing. In that context it has been defined as "closely akin to `fundamental unfairness' and possibly confined to a deprivation of due process." Howe v. Strelecki, 98 N.J. Super. 513, 521 (App.Div. 1968). Defendants also point out that this phrase has been used in setting the outer boundaries of the Legislature's power to enact statutes which apply retroactively. In that context the existence of "manifest injustice" depends on "whether the affected party relied, to his or her prejudice, on the law that is now to be changed as a result of the retroactive application of the statute, and whether the consequences of this reliance are so deleterious and irrevocable that it would be unfair to apply the statute retroactively." Gibbons v. Gibbons, 86 N.J. 515, 523-524 (1981); see also Department of Environmental Protection v. Ventron Corp., 94 N.J. 473, 498-499 (1983). The Public Advocate, in arguing for a more expansive interpretation, points out that avoidance of "manifest injustice" is one of the tests under R. 4:17-7 for permitting amendments of answers to interrogatories within 20 days of trial, and in that context findings of "manifest injustice" are readily made to serve "the overriding objective of giving the defaulting party his day in court." Westphal v. Guarino, 163 N.J. Super. 139, 146 (App.Div.), aff'd 78 N.J. 308 (1978); see also Pressler, Current N.J. Court Rules, Comment R. 4:17-7 (1985). It is evident from these examples that the phrase "manifest injustice" does not have a single, constant meaning. Rather, its meaning varies with the context in which it is used.
The subject addressed in § 16 is the circumstances under which a party with a Mount Laurel claim is required to exhaust administrative remedies. Indeed, § 16(b) specifically states that upon timely adoption by a municipality of a "resolution *439 of participation," a party "shall exhaust the review and mediation process of the council before being entitled to a trial on his complaint." Even more explicitly, § 18 refers to "the obligation to exhaust administrative remedies," § 19 refers to "the duty to exhaust administrative remedies" and § 9(b) refers to "exhaustion of administrative remedy requirements pursuant to section 16."
"Manifest injustice" and substantially similar phrases are frequently used in the New Jersey courts to describe the circumstances under which a party will be relieved of the obligation to exhaust administrative remedies. The rules governing actions in lieu of prerogative writs use a nearly synonymous phrase in defining the exception to the general requirement of exhaustion:

Except where it is manifest that the interest of justice requires otherwise, actions under R. 4:69 shall not be maintainable as long as there is available a right of review before an administrative agency which has not been exhausted. [R. 4:69-5; emphasis supplied]
Our courts also have repeatedly stated that the trial courts are vested with discretion "to determine whether the interests of justice require that the administrative process be bypassed." Durgin v. Brown, 37 N.J. 189, 203 (1962); see also Roadway Express, Inc. v. Kingsley, 37 N.J. 136, 141 (1962).
The New Jersey Legislature is presumed to be familiar with the rules of court and case law. Cf. Quaremba v. Allan, supra. Therefore, it must be assumed that the Legislature was aware when it enacted § 16(a) that the standard of "manifest injustice" contained therein was essentially the same standard as the courts have long used in determining when exhaustion of administrative remedies is required. It also must be assumed that the Legislature intended § 16(a) to be interpreted in light of the well-established body of case law governing exhaustion of administrative remedies.
The New Jersey courts have frequently discussed the considerations which determine whether administrative remedies *440 should be exhausted. For example, in Roadway Express, Inc. v. Kingsley, supra, the Court said:
[W]e ... are concerned with underlying considerations such as the relative delay and expense, the necessity for taking evidence and making factual determinations thereon, the nature of the agency and the extent of judgment, discretion and expertise involved, and such other pertinent factors (cf. 3 Davis, Administrative Law § 20.03 (1958)) as may fairly serve to aid in determining whether, on balance, the interests of justice dictate the extraordinary course of bypassing the administrative remedies made available by the Legislature. [37 N.J. at 141]
There have been a variety of circumstances in which the "interests of justice" have been found to require the bypassing of administrative remedies. See, e.g., N.J. Civil Service Ass'n v. State, 88 N.J. 605, 613 (1982); Atlantic City v. Laezza, 80 N.J. 255, 265-266 (1979); Durgin v. Brown, supra, 37 N.J. at 202-203; Swede v. Clifton, 22 N.J. 303, 314-315 (1956); Nolan v. Fitzpatrick, 9 N.J. 477 (1952); Exxon Corp. v. East Brunswick Tp., 192 N.J. Super. 329, 337-339 (App.Div. 1983), certif. den. 96 N.J. 312 (1984); East Orange v. Livingston Tp., 102 N.J. Super. 512, 519-521 (Law Div. 1968), aff'd 54 N.J. 96 (1968). Therefore, the pending motions to transfer must be assessed in light of the considerations recognized in the cases dealing with exhaustion of administrative remedies.
Before discussing the individual motions to transfer, one additional point should be addressed. As stated previously, § 16(a) directs the court to "consider whether transfer would result in a manifest injustice to any party to the litigation." (Emphasis supplied). Defendant municipalities argue that only the impact upon named parties to the litigation, generally developer plaintiffs and municipal defendants, may be considered in determining whether transfer to the council will cause manifest injustice. On the other hand, plaintiffs argue that the interests of lower income persons also must be taken into account in making this determination.
This court has previously determined that a Mount Laurel case, whether brought by a public interest organization or a developer, should be viewed as a representative action brought *441 on behalf of lower income persons whose constitutional rights allegedly have been denied by exclusionary zoning:
The constitutional right protected by the Mount Laurel doctrine is the right of lower income persons to seek housing without being subject to the economic discrimination caused by exclusionary zoning.... The Public Advocate and organizations such as the Fair Housing Council and N.A.A.C.P. have standing to pursue Mount Laurel litigation on behalf of lower income persons.... Developers and property owners with land suitable for lower income housing are also conferred standing to pursue Mount Laurel litigation.... In fact, the Court held that "any individual demonstrating an interest in, or any organization that has the objective of, securing lower income housing opportunities in a municipality will have standing to sue such municipality on Mount Laurel grounds...." However, such litigants are granted standing not to pursue their own interests, but rather as representatives of lower income persons whose constitutional rights allegedly have been violated by exclusionary zoning. [Morris Cty. Fair Housing Council v. Boonton Tp., supra, 197 N.J. Super. at 365-366; citations omitted]
Since Mount Laurel cases are representative actions, lower income persons must be treated as parties to all such litigation. It follows that "manifest injustice" determinations must take into consideration the impact of transfer not only upon the named parties but also upon lower income persons.

B. Morris County Fair Housing Council v. Denville; Seigler Associates v. Denville; Affordable Living Corp. v. Denville; Stonehedge Associates v. Denville; Cali v. Denville; Soussa v. Denville.

These cases have had a long and tortured history. On October 13, 1978, the Public Advocate filed suit on behalf of himself, the Morris County Fair Housing Council and the Morris County branch of the NAACP against Denville and twenty-six other municipalities in Morris County, alleging that the zoning ordinances of defendant municipalities were unconstitutional because they failed to provide a realistic opportunity for the construction of lower income housing. An appeal was taken by Denville and several other defendants challenging the Public Advocate's determination to file the lawsuit. His determination was affirmed in Morris Plains v. Department of Public Advocate, 169 N.J. Super. 403 (App.Div. 1979), certif. *442 den. 81 N.J. 411 (1979). Extensive discovery was conducted by all parties, numerous motions were filed, case management conferences were held and on March 19, 1980 the case was pretried. Subsequently, the Supreme Court stayed trial proceedings pending a decision in the Mount Laurel cases then before it. After the Mount Laurel II opinion was issued the case was assigned to this court in June 1983. Numerous additional case management conferences were held, further discovery was conducted and another pretrial conference was held on June 14, 1984. Settlements were reached before trial between the Public Advocate and nine of the remaining 12 defendant municipalities,[15] the Public Advocate having previously dismissed his claims against the other defendants. On July 2, 1984, trial commenced against Denville, as well as Randolph and Parsippany-Troy Hills, on all issues relating to calculation of the fair share obligations of those defendants. The trial continued for ten days until July 25, 1984, when the parties announced that they had reached a tentative settlement. This court determined that there was a reasonable likelihood this settlement would be finalized and would receive court approval. Since tentative settlements also had been reached with Randolph and Parsippany-Troy Hills, trial proceedings were suspended. However, on December 16, 1984, the governing body of Denville voted to repudiate the tentative settlement agreement. Therefore, the trial resumed on January 11, 1985 and was completed that same day. On January 14, 1985, this court issued an oral opinion which concluded that Denville's Mount Laurel obligation was 924 lower income housing units. The court later determined that Denville was entitled to a credit for 41 units previously made available and that its unmet Mount Laurel obligation was therefore 883 units. On March *443 14, 1985 an order was entered embodying this determination and directing Denville to rezone within 90 days of January 31, 1985. David Kinsey was appointed advisory master to assist Denville in rezoning and to provide recommendations to the court concerning the adequacy of the steps taken to achieve compliance with Mount Laurel. Between April and June 1985 Kinsey met on numerous occasions with all parties, including officials and representatives of Denville. His final report, submitted on August 13, 1985, states that Denville has not revised its zoning ordinance as required by the order of March 14, 1985. Although Denville prepared a Mount Laurel compliance plan, the master concluded that this plan is deficient in numerous respects. Consequently, the master prepared his own proposed compliance plan and drafted an ordinance which would implement that plan.
While the Public Advocate's action was pending, five developers also filed Mount Laurel actions against Denville  Siegler Associates (filed April 26, 1984); Affordable Living Corp., Inc. (filed July 2, 1984); Stonehedge Associates (filed December 31, 1984); Maurice and Esther H. Soussa (filed May 31, 1984); and Angelo Cali (filed July 9, 1985). These actions were all consolidated with the Public Advocate's action on the condition that developer plaintiffs would not participate in the hearing to determine Denville's fair share and would accept the results of that hearing. Developer plaintiffs participated actively in the meetings and discussions with the master, and an analysis of the suitability of each of their sites for Mount Laurel housing is included in his report. Siegler Associates' motion for partial summary judgment declaring Denville's zoning ordinance unconstitutional on Mount Laurel grounds was granted by order dated November 9, 1984.
The principles which govern the requirement of exhaustion of administrative remedies all strongly point to the conclusion that it would be a "manifest injustice" to plaintiffs and to the lower income persons they represent to require *444 exhaustion in this case. First, the history of this case, including Denville's withdrawal from the tentative settlement reached with the Public Advocate, indicates that use of the mediation process established by the act would be unlikely to result in a settlement and hence would be futile. Second, while the issues involve a significant element of expertise, it is doubtful whether the newly established council will have greater expertise than this court, which has been hearing similar cases for more than two years, or the master, who has spent more than four months evaluating Denville's compliance. Third, exhaustion of the administrative procedures set forth in the act would cause substantial delay. While this litigation probably can be brought to final judgment in a few months, the administrative process established by the act might take nearly two years to complete and even then the result probably would be simply a return to the courts for further litigation. Fourth, the parties might be required upon transfer to the council to incur substantial and unwarranted expense in relitigating before an administrative law judge the same issues already litigated for 12 days before the court.[16] Such relitigation would be inconsistent with one of the primary objectives of administrative adjudication, which is to provide a forum that is less time consuming and less expensive than the courts.[17] Finally and most importantly, *445 there is a need for a prompt decision in the public interest and a denial of immediate judicial relief would result in irreparable harm to lower income persons. As noted previously, the Court stated repeatedly in Mount Laurel II that unduly protracted legal proceedings had thwarted efforts to solve the problem of exclusionary zoning in the years following the Mount Laurel I decision.[18] To avoid a similar outcome here, this seven-year-old case must be brought to a conclusion.

C. Morris County Fair Housing Council v. Randolph; Randolph Mountain Industrial Complex v. Randolph.

Randolph is one of the other defendants in the Morris County exclusionary zoning suit brought by the Public Advocate. Through July 20, 1984, the history of the case against Randolph is the same as the case against Denville. On that date a tentative settlement was reached between the Public Advocate and Randolph. Upon this court concluding that there was a reasonable likelihood that the settlement would be finalized and receive court approval, it suspended trial proceedings against Randolph.
The reasons why the tentative settlement with Randolph was not finalized are more complicated than the breakdown of the Public Advocate's settlement with Denville. While Denville *446 simply withdrew from its tentative settlement, Randolph contends that it was prepared to conclude its settlement but was prevented from doing so by the delays of the Public Advocate. Counsel for Randolph has submitted an affidavit which asserts that a proposed stipulation of settlement and draft ordinance to implement the settlement were forwarded to the Public Advocate on August 31, 1984. The Public Advocate advised him orally in mid-September that there were some minor modifications to the ordinance which had to be made and that these would be prepared by the Public Advocate. However, these proposed revisions of the settlement documents were never submitted despite various telephone calls from counsel for Randolph to the Public Advocate, as well as conferences with the court in which assurances were given that these documents would be completed shortly.
Randolph also contends that the delay in finalizing the settlement caused by the Public Advocate's lack of diligence will impair its capacity to implement the settlement. Specifically, it alleges that a site which Randolph had planned to acquire from the State for the construction of 70 moderate income units has become unavailable because the State has decided to use the site for a motor vehicle inspection station. Randolph also alleges that the owner of one Mount Laurel housing site, Mal, Inc., has indicated it does not intend to construct lower income housing, and another, Randolph Mountain Industrial Complex, has said it cannot construct Mount Laurel housing at the density contemplated by the settlement. On the other hand, the Public Advocate contends that the delay in finalizing the settlement has not been caused by his failure to draft minor changes in the settlement documents but rather by the substantial problems which arose in connection with the motor vehicle inspection station, Randolph Mountain and Mal sites.
This court accepts Randolph's contention that some responsibility for the delay in finalizing the settlement rests with the Public Advocate. However, the court cannot conclude that the delay has impaired Randolph's capacity to implement the tentative *447 settlement. Every settlement agreement entered into by the Public Advocate provides that if any site rezoned for Mount Laurel housing becomes unavailable due to governmental acquisition, the municipality must rezone an additional site to take its place. Therefore, even if this settlement had been finalized before the State decided not to convey the motor vehicle inspection site to Randolph, the municipality would have been in the same position as it is now; it would have been required to find a substitute site. With respect to the two private sites, this court in reviewing proposed settlements of Mount Laurel cases routinely seeks some indication of an interest in constructing lower income housing from the owners of properties proposed to be rezoned. Therefore, the Public Advocate and the court presumably would have become aware of the problems with the Mal and Randolph Mountain sites before approval of the settlement, even if the Public Advocate had proceeded more expeditiously with his responsibilities under the settlement agreement. Furthermore, the possibility that one or more of the sites included in the settlement might become unavailable for Mount Laurel housing was specifically mentioned when the tentative settlement was placed on the record. Counsel for Randolph stated that the Public Advocate's expert had visited one 80- to 90-acre "back-up site" and that there were other possible back-up sites available.
This court is satisfied that under these circumstances manifest injustice to the Public Advocate, plaintiff public interest organizations and lower income persons would be caused by transfer to the council. While the Public Advocate's case against Randolph has not reached as advanced a stage as the one against Denville, there have been lengthy trial proceedings, and the remainder of the case could be completed within a relatively short time. Therefore, transfer to the council would cause significant delay. In addition, the parties probably would be put to substantial expense and effort in relitigating before an administrative law judge the same issues already litigated before this court. Most importantly, there is the same need in *448 Randolph as in Denville for the early conclusion of this seven-year-old litigation.
Furthermore, the act appears to recognize that the Public Advocate's claims against Denville and Randolph are entitled to special judicial consideration. As discussed previously, § 28 excludes suits brought by public interest organizations or filed before January 20, 1983 from the moratorium on the award of builder's remedies. Therefore, whether or not the builder's remedy moratorium is constitutional and however it may be interpreted, the exceptions to that moratorium reflect a legislative recognition that there should be no obstacle to the complete and final disposition within the judicial system of cases brought by public interest organizations or filed before January 20, 1983. The Public Advocate's suit falls within both of these classes of cases.
There is one additional issue raised by the cases against Denville and Randolph. One of the developer complaints against each municipality, the Cali complaint against Denville and the Randolph Mountain complaint against Randolph, was filed less that 60 days before the effective date of the act. Denville and Randolph argue that these complaints are subject to mandatory transfer to the council pursuant to § 16(b) even if the Public Advocate's suit and the suits by other developers continue to be litigated before this court. This raises the specter of the same issues being litigated simultaneously before this court and the council, with the possibility of inconsistent results. However, it is a basic principle of statutory interpretation that a statute should be construed reasonably and in conformity with its underlying intent. Fairlawn Shopper, Inc. v. Director, Div. of Taxation, 98 N.J. 64, 74 (1984). Here, no reasonable legislative purpose would be served by simultaneous litigation of the same issues before two separate tribunals. Furthermore, the Cali suit has been consolidated with the Public Advocate's suit, and the Randolph Mountain suit is also subject to consolidation with that suit. Since consolidation is *449 designed to serve the policies of economy and efficiency in litigation and "fuses the component cases into a single action," Ettin v. Ava Truck Leasing, Inc., 53 N.J. 463, 477 (1969), § 16 should be construed to permit all consolidated cases against a municipality to be heard by the court if manifest injustice would be caused by transfer of any one of the cases.
For these reasons, justice requires that all Mount Laurel litigation against Randolph and Denville should be permitted to proceed to a conclusion before this court.

D. Van Dalen v. Washington.

This case is in substantially the same procedural posture as the Denville case. A six-day trial was held to determine the boundaries of the growth area in Washington established in the SDGP and the validity of the SDGP designations within Washington. A further ten-day trial was held to determine the magnitude of Washington's fair share obligation and whether its existing zoning satisfied that obligation. This resulted in a 38-page written opinion which concluded that Washington has a total fair share of 227 units and that its existing zoning fails to provide a realistic opportunity for the construction of that number of lower income housing units. Van Dalen, supra. A master was thereafter appointed to assist Washington in rezoning and to make recommendations to the court concerning the award of a builder's remedy to the plaintiff. The master's report, submitted on August 9, 1985, evaluates the suitability of plaintiff's sites and the three other sites selected by Washington for Mount Laurel housing. This case is thus ready for a final hearing on Washington's plan for compliance with Mount Laurel.
For essentially the same reasons as in the Denville case, it would be a manifest injustice for Van Dalen v. Washington to be transferred. As in that case, there is no basis for optimism that the mediation processes of the council would be successful. Nor can it be said that the council has greater *450 expertise than this court in dealing with Mount Laurel compliance in Washington. Furthermore, transfer would cause substantial delay. Sixteen days of trial time have been consumed litigating to conclusion every issue in the case, except for the compliance with Mount Laurel of Washington's proposed rezoning and plaintiff's entitlement to a builder's remedy. The final stage of the case could be concluded within a short time. On the other hand, transfer to the council probably would extend this controversy  and the date of Washington's compliance with Mount Laurel  several more years. It also would impose a substantial added expense upon plaintiffs if they were required to relitigate before an administrative law judge essentially the same issues already litigated before this court. Finally, and most importantly, while this case has not been pending as long as the Public Advocate's suit, there is a comparable need here for a prompt decision in the public interest to avoid irreparable harm to lower income persons. Therefore, Washington's motion to transfer will be denied.

E. Rivell v. Tewksbury.

This is the most difficult of the pending motions. The complaint was filed on June 19, 1984. Thereafter, several case management conferences were held with the court, comprehensive expert reports were prepared and discovery was conducted. Trial was scheduled for July 23, 1985, but was adjourned because of pending settlement discussions and passage of the act. Those settlement discussions have been unsuccessful and the case could be rescheduled for trial within a short time.
Plaintiff contends that it has incurred substantial expense in preparing for trial and that, but for the bad faith of Tewskbury in conducting settlement discussions without a serious intent of attempting to resolve the controversy, the case would already *451 have been tried. It also contends that the sole purpose of Tewksbury in seeking transfer to the council is to further delay compliance with Mount Laurel.
It should be noted that the council is now functioning. Six nominees to the council have been confirmed by the Senate and appointed, and the three remaining positions on the council have been temporarily filled by the Governor by ad interim appointments pursuant to Article V, section I, paragraph 13 of the New Jersey Constitution. Furthermore, Tewksbury has filed a notice of intention to participate in the procedures established by the act. Therefore, the administrative process is now operative with respect to Tewksbury.
Under these circumstances this court concludes that respect for the administrative mechanism established by the Legislature for implementing Mount Laurel requires transfer to the council and that transfer will not cause "manifest injustice" to plaintiff or to lower income persons. Although this case is ready for trial, a significant period of time would be required to complete the litigation. The trial probably would be lengthy and expensive, since plaintiff not only seeks a determination of the size of Tewksbury's Mount Laurel obligation and the conformity of its zoning with that obligation, but also attacks the delineation in the SDGP of the extent of growth area within Tewksbury.[19] If Tewksbury's zoning were found *452 not to comply with Mount Laurel, a further significant period of time would be required to complete the rezoning, and if there were disagreement concerning the adequacy of that rezoning or plaintiff's entitlement to a builder's remedy, a second trial would have to be held on those issues. Therefore, substantially more time and money would be required to complete this case than the cases against Denville, Washington and even Randolph. Furthermore, whereas the Public Advocate's suit against Denville and Randolph is seven years old and the Van Dalen suit is more than two years old, this case was filed only a little over a year ago. Therefore, there is less danger in this case that transfer to the council would result in intolerably protracted legal proceedings.
Finally, Tewksbury's projected Mount Laurel obligation is relatively small. Unless plaintiff were to succeed in his challenge to the SDGP delineation of "growth area" in Tewksbury (and no such challenge has succeeded thus far in this court), Tewksbury's Mount Laurel obligation would be 136 units in the opinion of plaintiff's expert and 37 units in the opinion of Tewksbury's expert. If this court adheres to the methodologies accepted in Van Dalen v. Washington, supra, and Countryside v. Ringwood, supra, it appears from an initial review of the expert reports that Tewksbury's fair share would be around 100 lower income housing units. Therefore, viewed from the perspective of lower income persons, there is less to gain from the early conclusion of this litigation than in cases where the defendant municipality has a more substantial projected Mount Laurel obligation.
For these reasons, Tewksbury's motion to transfer will be granted.

F. Essex Glen, Inc v. Roseland.

This case was filed on June 27, 1985, which is within 60 days of the effective date of the act. Since Roseland has filed a *453 notice of participation in the procedures provided under the act, plaintiff is required by § 16(b) to exhaust the review and mediation process before being entitled to a trial on its complaint.
Essex Glen argues that although the exhaustion requirement of § 16(b) is phrased in mandatory terms, it is subject to the exception provided by R. 4:69-5 "where it is manifest that the interest of justice requires otherwise." However, § 16(a) provides in language nearly identical to R. 4:69-5 that in cases filed more than 60 days before the act's effective date, the administrative processes of the act need not be exhausted if "manifest injustice" would result to any party to the litigation. This exception to the exhaustion requirement would be superfluous if the Legislature had intended the same exception to be applicable in cases filed after the 60-day cut-off date. Therefore, it must be concluded that the Legislature intended exhaustion of administrative remedies to be mandatory in § 16(b) cases.
Essex Glen argues that if § 16(b) is construed to be mandatory, it is unconstitutional because the exception to the requirement of exhaustion of remedies provided by R. 4:69-5 is of constitutional dimension and may not be overridden by legislation. Requiring a litigant to exhaust administrative remedies, even if manifestly unjust, would raise substantial constitutional issues, particularly in a case involving the constitutionality of a municipal ordinance. Some of these constitutional problems are similar to those alluded to previously in discussing the moratorium on the award of builder's remedies. Since the New Jersey Constitution provides for judicial review of the validity of governmental action "in the manner provided by the rules of the Supreme Court, as of right," N.J. Const. (1947), Art. VI, § V, par. 4, the right to such review may not be impaired by the Legislature. See In re Senior Appeals Examiners, *454 60 N.J. 356, 363-366 (1972); Swede v. Clifton, 22 N.J. 303 (1956); Fischer v. Bedminster Tp., 5 N.J. 534, 540 (1950). However, it is unnecessary to decide the constitutionality of a mandatory exhaustion requirement because even assuming R. 4:69-5 were applicable, Essex Glen has failed to demonstrate that manifest injustice would result from requiring exhaustion of administrative remedies.
The complaint was filed only a few months ago. As far as is disclosed by the papers filed with the court, the only pretrial preparation completed thus far is a synopsis of a fair share analysis written by plaintiff's housing expert. Therefore, expert reports must be prepared and discovery conducted before this case could be ready for trial. This means that the case could not be tried until the Spring of 1986 at the earliest. In addition, even if Roseland's present zoning were held to be unconstitutional, a further significant period of time would be required to complete rezoning in compliance with Mount Laurel. Consequently, it is a matter of conjecture whether judicial proceedings could be completed in a substantially shorter time than the administrative procedures provided by the act. And if there is undue delay in the administrative process, Essex Glen may seek to have jurisdiction revert to the court as early as October 2, 1986.[20] It is also noteworthy that the Department of *455 Environmental Protection has imposed a moratorium on new sewer connections in the Roseland area and that Essex Glen owns only 16 acres of property. These circumstances raise doubts whether Essex Glen would be able to develop its property with lower income housing within a short period of time even if it were to succeed in this litigation. It further appears that Essex Glen could build, at the very most, 50 lower income housing units, and probably less. Under all these circumstances, requiring exhaustion of the administrative remedies provided by the act would not result in "manifest injustice" either to Essex Glen or to lower income persons.
The final question is whether the complaint should be dismissed or transferred to the council. Since the act does not state what formal disposition should be made of a case in which exhaustion is required pursuant to § 16(b), this court must decide what disposition is consistent with the purposes of the act and fair to the parties. The difference between dismissal and transfer to the council is not substantial. In either event, the court would lose jurisdiction over the controversy, at least temporarily, and it would be considered solely by the council. However, transfer might facilitate the reversion of jurisdiction to this court in the event one of the statutory circumstances for resumption of judicial proceedings were to occur. In addition, it would preserve whatever priority Essex Glen may have in seeking a "builder's remedy" if jurisdiction were to revert to *456 this court. See J.W. Field Co. v. Franklin Tp., 206 N.J. Super. 165 (Law Div. 1985). Therefore, Essex Glen's complaint against Roseland will be transferred to the council.

G. Conclusion.
For these reasons, orders will be entered denying transfer to the Council on Affordable Housing of the cases against Denville, Randolph and Washington and directing transfer to the council of the cases against Tewksbury and Roseland.
NOTES
[1] The constitutionality of the act is directly challenged by plaintiff in Essex Glen v. Roseland and two of the developer plaintiffs with cases against Denville, Stonehedge Associates and Siegler Associates. The brief for plaintiff in Van Dalen v. Washington Township states that "[t]he Act contains numerous apparent flaws, internal inconsistencies and loopholes" but "to the extent possible" it should be interpreted "in an effort to save it," and that it "can be interpreted to be a constitutional and valid exercise of the police power." The Public Advocate concludes that "it is reasonably foreseeable that transfer to the Affordable Housing Council will inevitably result in a failure to provide housing opportunities substantially equivalent to the municipality's constitutional fair share," but he too declines to challenge the act's constitutionality. The Attorney General has intervened to defend the constitutionality of the act.

The motions on behalf of Denville, Randolph and Washington could be decided without considering the constitutionality of the act, since "manifest injustice" would result from transfer of the cases against those municipalities to the council. However, the constitutional issues must be considered in connection with the Tewksbury and Roseland motions, since no "manifest injustice" would result from requiring the exhaustion of administrative remedies in these cases.
[2] The constitutionality of conferring authority upon an administrative agency in the executive branch of government to adopt regulations and to conduct administrative hearings to enforce constitutional rights is not questioned. See Matter of Egg Harbor Assocs. (Bayshore Centre), 94 N.J. 358 (1983); Robinson v. Cahill, 69 N.J. 449 (1976); Jenkins v. Morris Tp. Dist. and Bd. of Ed., 58 N.J. 483 (1971); see also Mount Laurel II, supra, 92 N.J. at 250-251.
[3] The review and mediation sections of the act present a number of difficult problems of interpretation. For example, §§ 15(a) and 16(b) confer explicit authority to seek mediation and review only upon a party who has either instituted litigation less than 60 days before the effective date of the act or filed an objection to a petition for substantive certification pursuant to § 14. However, it is implicit in § 16(a) that a case filed more than 60 days before the effective date of the act, which is transferred to the council, also will be subject to review and mediation. In fact, the order of transfer properly may be treated as a request for mediation and review.
[4] The act does not indicate when mediation and review of a transferred case is to begin. Section 15(d) of the bill originally enacted by the Legislature provided that "[t]he mediation process shall commence as soon as possible after the request for mediation and review is made, but in no case prior to the council's determination of housing regions and needs pursuant to section 7 of this act." This would have meant that mediation could have begun when the council adopted its "criteria and guidelines," which would be no later than August 1, 1986. However, the changes recommended by the Governor in his conditional veto message and later accepted by the Legislature deleted this sentence. The conditional veto message did not provide an explanation for this change. However, the most reasonable explanation is that it was contemplated that the timing of review and mediation would be determined by the council in its procedural rules to be adopted pursuant to § 8. Although a number of parties assume that mediation cannot begin until a municipality files its housing element, it is arguable that the most propitious time for mediation is while a municipality is developing its housing element. It may be anticipated that the council will address this issue at an early date.
[5] The act may be read to limit referral to the Office of Administrative Law and the administrative steps which follow to situations where a municipality has filed a petition for substantive certification. The term "mediation efforts" in § 15(c) seems to refer back to the preceding section, 15(b), which deals solely with mediation at the request of an objector to a petition for substantive certification. Furthermore, §§ 15(c) and 14(b), read together, seem to indicate that the outcome of a case referred to the Office of Administrative Law will be the grant or denial of substantive certification. Therefore, it is possible to read the act as permitting "review and mediation" to be completed in a transferred case without referral to the Office of Administrative Law if a municipality does not petition for substantive certification. However, it may be anticipated that most municipalities will petition for substantive certification once a request for mediation and review is filed. In addition, it is possible, as urged by the Attorney General, to treat a motion for transfer to the council as the equivalent of a petition for substantive certification.
[6] This calculation for transferred cases is made as follows:

 (1) Commencement of period for council to devise
 criteria and guidelines (§ 7)  January 1, 1986
 (2) Deadline for adoption of criteria and guidelines
 by council (§ 7)  August 1, 1986
 (3) Deadline for municipality to file housing element
 (§ 9(a)) (If mediation is not concluded when the
 housing element is filed, this date would have to
 be extended accordingly.)  January 1, 1987
 (4) Issuance of an initial decision by an
 administrative law judge (§ 15(c))  April 1, 1987
 (5) Issuance of a final decision by the council
 (N.J.S.A. 52:14B-10(c))  May 15, 1987
 (6) Corrective action by the municipality if required
 by the council (§ 14(b))  July 15, 1987
 (7) Adoption of an ordinance which complies with
 Mount Laurel (§ 14(b))  September 1, 1987

(1) Commencement of period for council to devise criteria and guidelines (§ 7)  January 1, 1986 (2) Deadline for adoption of criteria and guidelines by council (§ 7)  August 1, 1986 (3) Deadline for municipality to file housing element (§ 9(a)) (If mediation is not concluded when the housing element is filed, this date would have to be extended accordingly.)  January 1, 1987 (4) Issuance of an initial decision by an administrative law judge (§ 15(c))  April 1, 1987 (5) Issuance of a final decision by the council (N.J.S.A. 52:14B-10(c))  May 15, 1987 (6) Corrective action by the municipality if required by the council (§ 14(b))  July 15, 1987 (7) Adoption of an ordinance which complies with Mount Laurel (§ 14(b))  September 1, 1987
[7] Several parties point out that under § 13 the filing of a petition for substantive certification lies within the sole discretion of the municipality and that it may file a petition at any time within six years after filing its housing element. They argue that if council review of a petition is a prerequisite to resort to the courts, exhaustion of administrative remedies could be delayed for more than seven years. However, it is possible, reading §§ 14, 15 and 16 together, to conclude that a request for review and mediation or transfer under § 16 activates the procedure for substantive certification under § 14. In any event, the expiration of the period for exhaustion of administrative remedies is keyed not to council action on a "petition for substantive certification" but rather to "review and mediation," and that process must be completed within six months. Id. at § 19; see also id. at § 18 (which sets forth alternative conditions for satisfaction of the exhaustion requirement). Furthermore, any exhaustion of administrative remedies requirement which might take up to seven years to complete would be unreasonable, and therefore the act should be read to avoid such a requirement.
[8] One problem experienced both by litigants in preparing Mount Laurel cases for trial and by the courts in supervising rezoning in conformity with Mount Laurel has been the unavailability of planning experts with experience in dealing with Mount Laurel issues. Such experts have been difficult to retain, and their heavy workloads often have resulted in substantial delays in the submission of reports.
[9] The moratorium expires on the date when municipalities must file their housing elements which, as indicated in n. 6, supra, may be as late as January 1, 1987.
[10] The Attorney General, noting that section 28 defines a "builder's remedy" as "a court imposed remedy for a litigant" (emphasis added), takes the position that the moratorium only prohibits court ordered rezoning of a developer-plaintiff's property, thereby permitting rezoning of other properties with mandatory set-asides or density bonuses. A literal reading of section 28 may support this interpretation. However, this would place a property owner who had brought a Mount Laurel suit in a worse position than every other property owner in a municipality; only the plaintiff's property would be disqualified from being rezoned for Mount Laurel housing. It would be difficult to ascribe any purpose to such a provision other than penalizing a party for having filed a Mount Laurel action. Therefore, while section 28 would have a more limited role under the Attorney General's interpretation than is assumed in this opinion and hence would leave more room for a rezoning to achieve compliance with Mount Laurel during the moratorium period, it also would raise additional due process and equal protection issues by placing the entire onus of the moratorium on parties who file Mount Laurel actions.

Another possible reading of section 28 is that it allows rezoning with density bonuses or mandatory set-asides of even a developer-plaintiff's property, so long as no special preference is extended to that developer-plaintiff in the comprehensive rezoning of a municipality to achieve compliance with Mount Laurel. In Mount Laurel II, the term "builder's remedy" refers to a court order directing approval of the project or rezoning of the property of a developer-plaintiff who succeeds in Mount Laurel litigation. 92 N.J. at 279-280. In other words, the term refers to a preference for using the property of a successful developer-plaintiff in rezoning to achieve compliance with Mount Laurel. On the other hand, the definition of a "builder's remedy" in section 28 may apply literally to any court ordered rezoning which includes what are referred to in Mount Laurel II, 92 N.J. at 265-274, as "inclusionary zoning devices," i.e., either an authorization or a mandate for a developer to construct market priced units at a higher density than otherwise allowable in exchange for constructing a certain percentage of units affordable to lower income persons. However, if the constitutionality of section 28 can be preserved by reading it only to impose a moratorium upon the special preference extended successful developer-plaintiffs in Mount Laurel II rather than any rezoning with mandatory set-asides or density bonuses, it may be so interpreted.
[11] The comparison in fair share numbers was as follows:
 Rutgers regions AMG Realty regions
 Denville 1017 944
 Parsippany Troy-Hills 3027 2916
 Norwood 261 245
 Elmwood Park 466 462

[12] Although not in issue on these motions, it is doubtful whether a projection of housing needs of a municipality, as distinguished from a region, would ever be required in a fair share determination.
[13] One question the council will need to address in administering this section is whether a method can be devised by which any downward adjustment in one municipality's fair share can be offset by an increase in construction or rehabilitation of Mount Laurel units elsewhere in the same housing region.
[14] Section 16(a) does not, by its literal terms, require a court to transfer a pending case unless a finding of "manifest injustice" is made. It only requires a court "to consider" whether there will be "manifest injustice" if a case is transferred. However, "manifest injustice" is the only standard set forth in section 16(a) for making a transfer determination. Therefore, it is reasonable to conclude that this was meant to be the governing standard. Furthermore, this standard is sufficiently flexible to take into account all pertinent considerations relating to a transfer determination.
[15] Seven of these settlements have been approved by the court in accordance with the procedures set forth in Morris Cty. Fair Housing Council v. Boonton Tp., supra. The other two still have not been presented to the court for approval.
[16] It is a fundamental legal principle, embodied in the doctrines of collateral estoppel and law of the case, that once an issue has been fully and fairly litigated, it ordinarily is not subject to relitigation between the same parties either in the same or in subsequent litigation. Hackensack v. Winner, 82 N.J. 1 (1980); Gonzalez v. State, 75 N.J. 181, 186 (1977); State v. Powell, 176 N.J. Super. 190, 195-196 (App.Div. 1980), certif. den. 87 N.J. 333 (1981). However, there is an established exception to this principle where there has been an intervening change in the law. State Farm Mutual Ins. Co. v. Duel, 324 U.S. 154, 162, 65 S.Ct. 573, 577, 89 L.Ed.2d 812 (1944); State v. Sarto, 195 N.J. Super. 565, 570 (App.Div. 1984). Therefore, a party to a Mount Laurel case transferred to the council may argue that enactment of the act is a change in the law which requires relitigation of every issue already decided by this court.
[17] Consistent with this objective, motions to dismiss for failure to exhaust administrative remedies ordinarily should be filed early in litigation rather than after substantial trial proceedings already have been conducted. Boss v. Rockland Elec. Co., 95 N.J. 33, 40 (1983); East Orange v. Livingston Tp., supra, 102 N.J. Super. at 521.
[18] Denville argues that even if the court orders it to rezone in conformity with Mount Laurel, it has serious sewage disposal problems which will prevent the early construction of lower income housing. Denville's sewage disposal problems appear to be real and substantial. However, the master has suggested a number of means by which those problems may be addressed. Furthermore, a property owner whose land has been rezoned for development in conformity with Mount Laurel would have an incentive to pursue solutions to these problems which would not exist so long as this case is mired in legal proceedings. Therefore, it cannot be assumed that Denville's sewage disposal problems pose an insurmountable barrier to construction of lower income housing.
[19] It has been the experience of this court that both fair share determinations and challenges to the SDGP ordinarily require lengthy trial court proceedings. The trials relating to fair share determinations have taken from four to twelve days and the challenges to the SDGP have taken from two to eleven trial days. No significant trial time has been required to determine the lack of compliance of current zoning ordinances with Mount Laurel, since that issue either has been the subject of successful pretrial motions for summary judgment or has been conceded at trial.
[20] Section 19 provides that:

If the council has not completed its review and mediation process for a municipality within six months of receipt of a request by a party who has instituted litigation, the party may file a motion with a court of competent jurisdiction to be relieved of the duty to exhaust administrative remedies. In the case of review and mediation requests filed within nine months after this act takes effect, the six-month completion date shall not begin to run until nine months after this act takes effect.
The Attorney General argues that there is an inconsistency between § 9(a) which may allow a municipality to wait until as late as January 1, 1987 to file its housing element (see footnote 6), and the last sentence of § 19, which would permit the court to relieve a party of its duty to exhaust administrative remedies as early as October 2, 1986, and that the last sentence of § 19 should therefore be disregarded. However, it is not self-evident that mediation must be delayed until after a municipality files its housing element (see footnote 4) or that a municipality which is a defendant in Mount Laurel litigation will require the maximum time period allowed by statute to complete its housing element. In any event, § 19 simply authorizes a party to seek relief from the obligation to exhaust administrative remedies, and it may be assumed that a court would deny that relief if further administrative proceedings would be in the public interest and fair to interested parties.